**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| RULE 14 LLC, | § | |
| | § | Case No.2:23-cv-627-JRG-RSP |
| Plaintiff, | § | |
| | § | DEMAND FOR JURY TRIAL |
| v. | § | |
| | § | |
| UIPATH INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**UIPATH'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND OF THE PATENTS .......................................................................... 1

III.  ARGUMENT ............................................................................................................... 3

    A.    "[generating/generate], via a first user, a query based at least in part on a topic of interest" / "[generating/to generate], by an entity, a query based at least in part on a topic of interest" ................................................................. 3

        1.    [generating/generate], via a first user does not include [generating/generate], via a general-purpose computer. ........................... 3

        2.    If the "user" or "entity" includes a computer or processor (e.g. a query generator or query module), the claims invoke § 112(f). ................. 5

        3.    The "generating terms," are Indefinite if Subject to § 112(f) for Lack of Algorithmic Support. ................................................................ 11

    B.    "[expanding/expand] search terms of the query" ................................................. 14

    C.    "accuracy threshold[s]" ...................................................................................... 17

        1.    Purely Subjective Terms are Indefinite if Objective Standards Not Found in Specification .................................................................. 17

        2.    The term is Purely Subjective and the Specification Proivides no Objective Understanding, rendering the Claims Indefinite ..................... 18

    D.    "extractors" ........................................................................................................ 19

    E.    "[establishing/establish] a . . . communication channel" ..................................... 21

    F.    "entity" .............................................................................................................. 22

        1.    The Intrinsic Evidence Supports that an "entity" is Not Merely a "user." ...................................................................................... 22

    G.    The "extraction rate," "processing rate," and "dynamically adjust" terms ........... 25

        1.    Identifying *what* "determining" an "extraction/processing rate" and "dynamically adjust[ing] the number of parallel processors" means depends on identifying *how* to perform the "determining" and "dynamically adjust[ing]" ............................................................... 25

        2.    Rule 14 does not deny that the '679 Patent does not teach *any way* to perform the "extraction rate," "processing rate," and "dynamically adjust" terms. ................................................................ 26

    H.    "that matches the query" ..................................................................................... 27

        1.    Rule 14 admits "that matches the query" includes an error. ..................... 28

        2.    However, the Claim is Not Amenable to Correction ............................... 28

        3.    The limitation "that matches the query" is indefinite as written. ............. 30

IV.   CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
   350 F.3d 1365 (Fed. Cir. 2003) ................................................................. 20

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
   830 F.3d 1341 (Fed. Cir. 2016) ................................................................... 7

*Alcatel USA, Inc. v. Tekelec, Inc.*,
   2002 WL 34454104 (E.D. Tex. Mar. 5, 2002) ......................................... 22

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
   414 F. Supp. 3d 304 (E.D.N.Y. 2019) ..................................................... 30

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game,
   Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) ................................................. 9, 12

*Atlas IP, LLC v. Medtronic, Inc.*,
   809 F.3d 599 (Fed. Cir. 2015) ................................................................. 22

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009) ............................................................... 13

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   381 F.3d 1371 (Fed. Cir. 2004) ................................................................. 8

*Clear Imaging Rsch., LLC v. Samsung Elecs. Co.*,
   No. 2:19-CV-00326-JRG, 2020 WL 6384731 (E.D. Tex. Oct. 30, 2020) ............................... 11

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*,
   382 F. Supp. 3d 586 (E.D. Tex. 2019) ..................................................... 18

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ......................................................... 17, 18

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc. (d/b/a The Home Depot)*,
   412 F.3d 1291 (Fed. Cir. 2005) ............................................................... 13

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
   803 F.3d 620 (Fed. Cir. 2015) ................................................................. 26

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) ............................................................... 11

ii

*Earnie Ball, Inc. v. Earvana, LLC*, No. 2012-1276,
    501 Fed. Appx. 971, (Fed. Cir. Jan. 24, 2013) ........................................................ 17

*Eolas Techs., Inc. v. Adobe Sys.*, Inc.,
    810 F. Supp. 2d 795 (E.D. Tex. 2011) .................................................................... 11

*Fargo Elecs., Inc. v. Iris, Ltd., Inc.*,
    287 F. App'x 96 (Fed. Cir. 2008) ..................................................................... 28, 30

*Freeny v. Murphy USA Inc.*,
    2015 WL 294102 (E.D. Tex. Jan. 21, 2015) ........................................................... 14

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013) ............................................................................ 13

*G+ Commc'ns, LLC v. Samsung Elecs. Co.*,
    No. 2:22-CV-00078-JRG, 2023 WL 4534366 (E.D. Tex. July 13, 2023) ............... 11

*Grecia v. Samsung Elecs. Am., Inc.*,
    780 F. App'x 912 (Fed. Cir. 2019) ........................................................................ 7

*Halliburton Energy Servs., Inc. v. M-I, LLC*,
    456 F.Supp.2d 811 (E.D. Tex. 2006) .................................................................... 18

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ............................................................................ 12

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    902 F.3d 1372 (Fed. Cir. 2018) ..................................................................... 16, 17

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ....................................................................... 9, 17

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed.Cir.2005) ............................................................................. 30

*Koninklijke KPN N.V. v. Telefonaktiebolaget LM Ericsson*,
    2022 WL 811072 (E.D. Tex. Mar. 16, 2022) ....................................................... 6, 7

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*,
    462 F.3d 1344 (Fed.Cir.2006) .............................................................................. 5

*Media Rights Technologies, Inc. v. Capital One Financial Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015) ............................................................................ 8

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ............................................................................ 20

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014) ........................................................................... 22

*MicroStrategy Inc. v. Bus. Objects Americas*,
    238 F. App'x 605 (Fed. Cir. 2007) ...................................................................... 16

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ............................................................................ 18

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003) ..................................................................... 27, 28

*O.I. Corp. v. Tekmar Co.*,
    115 F.3d 1576 (Fed. Cir. 1997) ............................................................................. 8

*Ocean Semiconductor LLC v. Huawei Device USA, Inc.*,
    2022 WL 389916 (E.D. Tex. Feb. 8, 2022) .......................................................... 27

*On Demand Machine Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) ............................................................................. 8

*OnPoint Sys., LLC v. Protect Animals With Satellites, LLC*,
    2022 WL 1612070 (E.D. Tex. May 20, 2022) ...................................................... 19

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
    989 F.3d 1002 (Fed. Cir. 2021) ......................................................................... 7, 8

*SightSound Techs., LLC v. Apple Inc.*,
    809 F.3d 1307 (Fed. Cir. 2015) ........................................................................... 22

*Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*,
    2010 WL 2292316 (N.D. Cal. June 7, 2010) ......................................................... 9

*St. Isidore Rsch., LLC v. Comerica Inc.*,
    2016 WL 4988246 (E.D. Tex. Sept. 19, 2016) ..................................................... 10

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ..................................................................... 25, 26

*Tracktime, LLC v. Amazon.com, Inc.*,
    2021 WL 2823163 (D. Del. July 7, 2021) ............................................................ 10

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*,
    681 F. App'x 898 (Fed. Cir. 2017) ...................................................................... 28

*Ultravision Techs., LLC v. Govision, LLC*,
    2023 WL 2182285 (Fed. Cir. Feb. 23, 2023) ....................................................... 20

*VDPP LLC v. Vizio, Inc.*,
   2022 WL 885771 (Fed. Cir. Mar. 25, 2022) ............................................................ 11

*Virginia Innovation Scis., Inc. v. Amazon.com, Inc.*,
   2019 WL 4259020 (E.D. Tex. Sept. 9, 2019) ........................................................ 11

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ...................................................................... 5, 6, 7

*WSOU Invs. LLC v. Google LLC*,
   2023 WL 6889033 (Fed. Cir. Oct. 19, 2023) ..................................................... 9, 10

*Zeroclick, LLC v. Apple Inc.*,
   *891 F.3d 1003 (Fed. Cir. 2018)* ...................................................................... 11

Statutes

35 U.S.C. 103(a) ........................................................................................... 23

35 U.S.C. § 112(f) ................................................................................... passim

Defendant UiPath Inc. ("UiPath") submits this responsive brief in support of its claim constructions in response to Rule 14 LLC's ("Rule 14") opening brief (Dkt. 68) and pursuant to Local Patent Rule 4-5(b) and Dkt. 21.

## I.    INTRODUCTION

Rule 14 asserted each of U.S. Patent Nos. 9,229,977 (the "'977 Patent") (attached as Ex. 1), 10,108,679 (the "'679 Patent") (attached as Ex. 2), and 11,048,712 (the "'712 Patent") (attached as Ex. 3) (collectively, the "Asserted Patents") against UiPath. Dkt. 37. However, a number of the asserted claims are indefinite because they utilize various terms that fail to convey to a POSITA, with reasonable certainty, their scope. Furthermore, in an effort to apply patents directed to real-time internet searches to 17 of UiPath's products that have nothing to do with the claimed inventions, Rule 14 has adopted unreasonably broad interpretations that are unsupported by the specifications. The Court should adopt UiPath's positions for the proposed claim terms below to prevent Rule 14's tortured effort to read its patents on UiPath's completely unrelated products.

## II.    BACKGROUND OF THE PATENTS

Rule 14 admits that the Asserted Patents are directed to conducting internet searches. Dkt. 68 at 2 ("Unlike pre-internet data, data on the internet is decentralized, unstructured, and dynamic… There was thus an unmet need to be able to mine these new 'unstructured datasets.'") To mine these "unstructured datasets," the '977 Patent generally claims analyzing data through generating, expanding the search terms of, and executing a query, selecting a data source to monitor, and establishing a communication channel to later communicate. Ex. 1 at Claim 1 (20:12–28). [1]

---

[1] The Asserted Patents share specifications in relevant part. For terms that are recited in multiple patents, this brief cites to the '977 Patent specification to refer to the identical language in each

That said, the claims of the asserted patents are replete with ambiguities, errors, and terms that simply find no support or understanding in the specification. For example, the '977 Patent recites "[generating/generate], via a first user, a query." The specification limits query generation to *either* a user or query generator. Ex. 1 at 4:12–14. Rule 14 argues that "user" includes a computer but even if this were the case, the '977 Patent discloses nothing more than general-purpose computers ('977 Patent 19:5-20) and does not teach an algorithm for "generating…a query."

Further, "[expanding/expand] search terms of the query" is boundless in scope if not limited to "applying a lexicon to add additional terms to the search query" as described by the specification. Ex. 1 at 4:17-19; 6:40–44. The Asserted Patents' specifications consistently describe "expanding search terms of the query" as applying a lexicon. E.g., Ex. 1 at 6:40–41. Beyond that, there is no plain and ordinary meaning to a POSITA for "expanding search terms" of a query.

Additionally, the '977 Patent recites "selecting" a data source when "results of the query are greater than or equal to an *accuracy thresholds*." Ex. 1 at claim 1. However, the specification never mentions an "accuracy threshold." Nor does it describe how to determine whether "results of the query are greater than or equal to an accuracy threshold." Rather, the '977 Patent broadly discloses "[i]f the results are satisfactory, specific data sources may be selected to be monitored" or "data sources are selected based on the accuracy of the search results." E.g., Ex. 1 at 4:54–56; 6:54–55. A claim that relies so expressly on the subjective notions of what is "accurate" and "satisfactory" cannot possibly survive an indefiniteness challenge.

---

applicable patent.

As described in more detail below, the various claims should be found indefinite for the many reasons discussed below and, if not, construed as UiPath proposes.

### III.    ARGUMENT

#### A.    "[generating/generate], via a first user, a query based at least in part on a topic of interest" / "[generating/to generate], by an entity, a query based at least in part on a topic of interest"

| Term | Rule 14's Construction | UiPath's Construction |
|---|---|---|
| [generating/generate], via a first user, a query based at least in part on a topic of interest<br><br>'977 Patent, claims 1, 10, 19<br><br>[generating/to generate], by an entity, a query based at least in part on a topic of interest<br><br>'679 Patent, claims 1, 11, 16 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite, not subject to § 112(f)<br><br>If subject to § 112(f), then:<br><br>**Function**: generating, via a first user, a query based at least in part on a topic of interest / generate, by an entity, a query based at least in part on a topic of interest<br><br>**Structure**: "query setup module 402," "query module 400," "query generator," and "electronic hardware, computer software, or combinations of both" implementing the algorithm described in the '977 Patent at 4:9-15 and the '679 Patent at 4:14-20. | Subject to § 112(f) and indefinite if interpreted as Rule 14 contends to cover queries generated by a computer instead of a user/entity, as the only structure in the specification for such query generation is a "query generator", which is nothing more than a general purpose computer or processor.<br><br>**Function**: [generating/generate] a query<br><br>**Structure**: "query generator" without algorithmic support and, therefore, indefinite.<br><br>If the "query setup module 402," "query module 400," "query generator," and/or "electronic hardware, computer software, or combinations of both" are also considered structure, the structure remains nothing more than a general purpose computer or processor and the term is still indefinite for lack of algorithmic support. |

1.    **[generating/generate], via a first user does not include [generating/generate], via a general-purpose computer.**

3

As an initial matter, the '977 Patent describes how a query may be generated by either a.) a user or b.) a query generator. Ex. 1 at 4:12–14 ("The query may be a natural language query generated by a user. Alternatively, the query generation may be automated from a query generator.")  However, the claims of the '977 Patent only recite generation **via a first user**, meaning that generation by a computerized query generator (as opposed to human user) was not intended to be covered by the claim. Despite this, Rule 14 has insisted in its infringement contentions that generation by a "user" includes generations by a computer—requiring that the Court resolve this dispute. *See* Ex. 4 (Excerpt of 12.11.2024 Plaintiff's Disclosure of Asserted Claims and Infringement Contentions, Exhibit A) at 15 (Rule 14 alleges that this term covers queries generated "via a robot or AI.")

The '977 Patent does not mention the "query generator" again. The '977 Patent further describes, however, modules which generate or create queries, which are presumably components of the query generator. Ex. 1 at 5:40-41 ("The data mining system 200 may include a query module 202 for generating a query."); 9:24-31 ("query module 400 includes a query setup module 402 for creating a query.") There does not appear to be any appreciable difference between the modules and generator as the '977 Patent does not actually describe how either generates a query. Finally, the '977 Patent discloses "electronic hardware, computer software, or combinations of both" as implementing "elements" of the disclosed "data mining systems." Ex. 1 at 3:27–37. Each of the "query generator," "query module 202," "query module 400," "query setup module 402," and "electronic hardware, computer software, or combinations of both" are general-purpose computers.

> The various illustrative logical blocks, modules, and circuits described in connection with the disclosure herein may be implemented or performed with a **general-purpose processor**…
>
> Ex. 1 at 19:5-20 (emphasis added).

The '977 Patent discloses that a user is an alternative to one of the general-purpose computers, the "query generator." Ex. 1 at 4:11–14. Accordingly, "[generating/generate], via a first user" should not be construed to include [generating/generate], via a computer.

### 2. If the "user" or "entity" includes a computer or processor (e.g. a query generator or query module), the claims invoke § 112(f).

If generation by a "user" or "entity" are interpreted as covering generation by a computer as Rule 14 contends, then the claims recite nothing more than a generic means—a computer or processor—for performing a claimed function—rendering them subject to construction under § 112(f).

"Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112, para. 6."[2] *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). Traditionally, courts would look to whether the term "means" appeared in the claims to determine whether § 112(f) applied. *Id.* at 1348. In the absence of the term, "means," patent applicants accomplish means-plus-function claiming through "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words." *Id.* at 1350. These terms "reflect nothing more than verbal constructs . . . used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6." *Id.* (citing *Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed.Cir.2006)). Even so, without the word "means," there is a rebuttable presumption that a term is not drafted in a means-plus-function manner. *Williamson* at 1348. However, the presumption is not strong. *Id.* at 1349. Overall, "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite

---

[2] The same language is now designated as 35 U.S.C. § 112(f).

meaning as the name for structure." *Id.* §112(f) applies if "the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (internal citations omitted).

In a world where "user" and "entity" are used, as Rule 14 insists, to cover generic computerized components such as a "query generator" or a "query module" as described in the specification—the claims must be subject to means-plus-function construction under §112(f).

       i. '977 Patent Claim 1 and '679 Patent Claim 1 (Method Claims).

The specification only describes the following generic components as capable of performing the function of "generating a query": a "query generator," "query module 202," "query module 400," "query setup module 402," and "electronic hardware, computer software, or combinations of both." *See Supra* III.A.1.

None of the terms above constitute definite structure or sufficient structure for performing the function of generating a query. *See* Ex. 5 (2025-01-15 Corrected Declaration of Dr. Jonathan Krein re Joint Claim Construction) at ¶62 ("'Query generator' is a term that appears in a variety of contexts but has no specific or consistent well-known meaning to a POSITA"); ¶63 ("…These 'modules' are also generic abstractions for a general-purpose computer or processor—as the specification itself acknowledges. However, the specification gives no guidance as to how the modules generate queries."); *See also* Ex. 1 at 19:5–20; Ex. 5 at ¶63 ("The 'electronic hardware, computer software, or combinations of both' is referenced generally in the specification and a POSITA would not be know how to tie this structure to the claimed function of 'generating … a query.'") For example, the Asserted Patents disclose that query module 202 "may be implemented as electronic hardware, computer software, or combinations of both." Ex. 1 at 5:26–29; *see also Koninklijke KPN N.V. v. Telefonaktiebolaget LM Ericsson,*

2022 WL 811072, at *14 (E.D. Tex. Mar. 16, 2022) ("Information collector" lacked sufficient structural connotation where specification disclosed that it "may be implemented in hardware or in a combination of software and hardware").

Even had the claims themselves recited "query module," "query setup module," and "query generator," this would not be sufficient structure to avoid a means-plus-function interpretation. "Module" is a well-known nonce word. *Williamson* at 1350. It provides no indication of structure. *Id. See also Grecia v. Samsung Elecs. Am., Inc.*, 780 F. App'x 912, 915 (Fed. Cir. 2019) ("'module' does not provide any indication of structure . . . Nor does the prefix 'customization' impart structure, because it at best describes the module's intended functionality.") "Query generator" is a nonce term subject to § 112(f) because it recites "abstract elements 'for' causing actions." *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016) ("symbol generator" was subject to § 112(f) because the term "by itself, does not identify a structure by its function" and "[i]rrespective of whether the terms 'symbol' and 'generator' are terms of art in computer science, the combination of the terms as used in the context of the relevant claim language suggests that it is simply an abstraction that describes the function being performed (i.e., the generation of symbols)").

Therefore, the "generating" terms of the method claims do not recite sufficient structure and invoke §112(f).

To avoid the argument completely, Rule 14 argues that the method claims are not subject to §112(f) because "they do not recite a function in the first place." Dkt 68 at 4. This is not the case. "Applicants are free to invoke § 112 ¶ 6 for a claim term nested in a method claim. We have never held otherwise." *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021). In *Rain Computing*, the Federal Circuit found that a method claim reciting

a "user identification module" was indefinite whether or not it was found in a method claim. *Id.* at 1006–1008. *Rain Computing* is not an anomaly. The Federal Circuit held similarly for method claims in other cases as well. *See, e.g., Media Rights Technologies, Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015); *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006).

There is simply no basis for Rule 14's contention that method claims are not amenable to means-plus-function construction. The only computers capable of generating a query described in the patents' specifications are general-purpose computers. Ex. 1 at 19:5-20. Under Rule 14's interpretation, "via a first user" or "by an entity" also means "via a query generator" and "by a query generator." Therefore, like *Rain Computing, Media Rights,* and *On Demand*, the "generating" method limitations include nested means-plus-function terms.

Rule 14 cites to two cases to demonstrate that "a method is not a function." Dkt. 68 at 5. (citing *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1382 (Fed. Cir. 2004)). However, in *O.I. Corp*, the term at issue was "passing the analyte slug through a passage." *O.I. Corp* at 1383. In *Cardiac Pacemakers*, the term at issue was "determining a condition of the heart from among a plurality of conditions of the heart." *Cardiac Pacemakers* at 1381. Neither of these claim limitations recite the means through which the "passing" or "determining" occurs. The '977 and '679 Patent do. "Generating, *via a first user*…" and "generating, *by an entity*…"

Therefore, the method claims are subject to, and invoke, §112(f).

ii.    '977 Patent Claims 10 and 19 and '679 Patent Claims 11 and 16 (Apparatus Claims).

The apparatus claims include the same "via a first user," and "by an entity" language as the method claims described above. Ex. 1 at Claims 10 and 19; Ex. 2 at Claim 11 and 16.

Therefore, the apparatus claims are subject to and invoke §112(f) for the same reasons as described above. These claims also additionally recite that a "processor" or "program code" is configured to accomplish the "generating" functions. The Asserted Patents do not explain how "processor" and "program code" "generates…a query" via a "first user" and/or "entity." However, the blurring of lines between "processor," "program code," "first user," and "entity" only supports the nonce nature of the use of the terms "processor" and "program code" and why a POSITA would not understand these terms to constitute a sufficiently definite structure for performing the claimed function of generating a query. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art").

The Federal Circuit has held, "[i]n cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Later, another court took this reasoning regarding corresponding structure in the specification and applied it in the claims when determining whether a term constituted means-plus-function claiming in the first place. *Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*, 2010 WL 2292316, at *12 (N.D. Cal. June 7, 2010) ("if 'computer' is insufficient structure for a 'means' limitation, the naked term 'computer' cannot describe sufficient structure when recited directly in the claim limitation.").

Further, in cases where "processor" and "program code" are described broadly in the claims and specification within the context of the specific invention, courts will hold that "processor" and "program code" are means-plus-function terms. *WSOU Invs. LLC v. Google*

*LLC*, 2023 WL 6889033, at *4 (Fed. Cir. Oct. 19, 2023) ("In the context of this claim, this specification, and this specific invention, 'processor' is so generically and functionally described as to fail to convey a sufficiently definite meaning as a name for a structure."); *St. Isidore Rsch., LLC v. Comerica Inc.*, 2016 WL 4988246, at *14 (E.D. Tex. Sept. 19, 2016) (Processor invoked § 112 ¶ 6 when specification did not detail processor's objectives and operations); *Tracktime, LLC v. Amazon.com, Inc.*, 2021 WL 2823163, at *6 (D. Del. July 7, 2021) (executable program code invoked § 112 ¶ 6 when specification did not refer to specific existing code or disclose what code was).

Here, the mere recitations of "processor" and "program code" are insufficient to avoid the application of §112(f). The "processor" of the '977 and '679 Patents is generically and functionally claimed. Aside from the general recitation of "memory unit," a processor is recited in the claims only with respect to the function it performs. Ex. 1 at Claim 10; Ex. 2 at Claim 11. The specification repeats the function of the processor recited in the claims and names generic types of processors for performing the "elements" of the data mining system without specifically tying any one type of processor to the function of "generating" a query. E.g., Ex. 1 at 2:15–26; 3:38–55. The "program code" is generically and functionally claimed. Ex. 1 at Claim 19; Ex. 2 at Claim 16. Like in *Tracktime*, the '977 and '679 Patent claims do not recite that "program code" is an existing code and what that code would be. Further, references in the specification are either functional just as the claims recite or simply define, in the broadest possible sense, "program code." E.g., Ex. 1 at 2:27–39; 4:1–2.

Rule 14 relies on a number of inapposite cases for the proposition that the terms "processor" and "program code" connote sufficient structure to avoid §112(f). Dkt. 68 at 7-8. For example, the claims of the single patent found not subject to §112(f) in *WSOU* actually described

in detail the steps to be performed by the claimed processor, program code, and memory (*See e.g.,* Ex. 6 at Claim 1)—which is distinguishable from the functional "generation of a query" at issue here. Likewise, the additional cases Rule 14 cites involve detailed steps *within the claims* for the recited components or off-the-shelf functions (which Rule 14 does not assert "generating…a query" to be) permitting the terms to avoid invoking §112(f). *See e.g., Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1368 (Fed. Cir. 2022) ("code" connotes structure when coupled with claim language describing its operation and function is "off-the-shelf"); *Clear Imaging Rsch., LLC v. Samsung Elecs. Co.*, No. 2:19-CV-00326-JRG, 2020 WL 6384731, at *9 (E.D. Tex. Oct. 30, 2020) (sufficient structure where claim "set forth how the processor operates" in conjunction with other components to achieve objectives); *G+ Commc'ns, LLC v. Samsung Elecs. Co.*, No. 2:22-CV-00078-JRG, 2023 WL 4534366, at *17 (E.D. Tex. July 13, 2023) (claim recited "detailed algorithm" for claimed processor); *VDPP LLC v. Vizio, Inc.*, 2022 WL 885771, at *1 (Fed. Cir. Mar. 25, 2022) (claims recited how processor operates in conjunction with other components); *Virginia Innovation Scis., Inc. v. Amazon.com, Inc.*, 2019 WL 4259020, at *31 (E.D. Tex. Sept. 9, 2019) (Claim recited "substantial detail regarding instructions included in the program code"); *Eolas Techs., Inc. v. Adobe Sys.*, Inc., 810 F. Supp. 2d 795, 810 (E.D. Tex. 2011) (Claim recited code and "a description of the code's (or software's) operation"); *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1006 (Fed. Cir. 2018) (Claim recited how processor and code operated together in "relatively simple" patents).

Therefore, the "generating" terms of the apparatus claims do not recite sufficient structure and invoke §112(f).

### 3. The "generating terms," are Indefinite if Subject to §112(f) for Lack of Algorithmic Support.

The only corresponding structure for the functions of "[generating/generate] a query" as recited in the '977 and '679 Patents are generic abstractions (e.g. query generator and query modules) that are nothing more than general purpose computers. Each of the "query generator," "query module 202," "query module 400," "query setup module 402," and "electronic hardware, computer software, or combinations of both" are general-purpose computers as admitted by the Asserted Patents' specifications. *See Supra* III.A.1. The "processor" and "program code" are also black block generic abstractions performing functions implemented by a computer. *See Supra* III.A.2.b.ii.

Rule 14's expert does not dispute this. Ex. 7 (Deposition of Christopher Thompson (Jan. 23, 2025)) at 44:14–45:2 ("Q: In the second sentence here, you say: A POSITA would understand that electronic hardware, computer software or combinations of both are general purpose devices on which the specifications disclosed algorithms for generating can be performed. Do you see that? A: I do. Q: I just want to be clear, you don't dispute that when it comes to the structure for performing this claim, the structure is a general purpose device, correct? [Rule 14's Counsel]: Objection, form. A: No.")

Disclosing, as corresponding structure, a general-purpose computer for a claimed function will not satisfy the requirements of §112(f). *Aristocrat* at 1333 (Claiming a means for performing a function and disclosing only a general-purpose computer amounts to pure functional claiming. This does not limit the claim's scope to the specific structure, material, or acts required by section 112, ¶ 6.)

Thus, the only way to save the "generating" terms from indefiniteness under §112(f) is to limit them to an algorithm disclosed in the specification for performing the "generating . . . a query" function recited in the claims. *Harris Corp. v. Ericsson Inc*., 417 F.3d 1241, 1253 (Fed.

Cir. 2005) (A computer-implemented means-plus-function term is limited to the disclosed algorithm.)  Here, there is no such algorithm.

A patent's specification may express an algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013). Further, an algorithm must describe *how* an outcome is achieved, not *what* the desired outcome is. *Blackboard, Inc. v. Desire2Learn, Inc*., 574 F.3d 1371, 1384 (Fed. Cir. 2009) (Finding a means-plus-function claim indefinite because the specification only described the function without explaining how to perform it.). In the absence of algorithm, not even one of skill in the art can save a patent from indefiniteness under §112(f). *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc. (d/b/a The Home Depot)*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) (POSITA testimony cannot replace the complete lack of structure in the specification.).

The '977 and '679 Patents are devoid of an algorithm for how to generate a query. E.g., Ex. 5 at ¶60 ("Neither the patent nor the prosecution history of the '977 Patent provide any algorithm or guidance on how such a 'query generator' operates."); *See also* ¶68.

Rule 14 points to the following portions of the '977 Patent for disclosure of a purported algorithm: "The query may be a natural language query generated by a user. Alternatively, the query generation may be automated from a query generator. The query generator may be based on artificial intelligence or a similar system." Dkt. 68 at 12 (citing Ex. 1 at 4:11–15; *See also* 5:40–50; 9:24–39).

This disclosure describes *what* a query is. Ex. 1 at 5:46–47. At best, the above discloses *who* or *what* may generate the query. Ex. 1 at 4:11–12. Nowhere, however, does the above disclosure teach *how* to generate a query. *See also* Ex. 7 at 46:13–49:17.

13

Finally, Rule 14 points to *Freeny v. Murphy USA Inc.*, to argue that "some structure and guidance" is sufficient to satisfy the requirement for an algorithm. Dkt. 68 at 12; 2015 WL 294102, at *33 (E.D. Tex. Jan. 21, 2015). However, in *Freeny*, the court also found that "the specification provides specific guidance as to various embodiments of a 'price change algorithm' that show _**how**_ values are calculated and combined." *Freeny* at 33. Here, unlike in *Freeny*, the Asserted Patents provide no examples of a query generating algorithm.

Therefore, the "generating" terms are indefinite under §112(f) because no algorithm is disclosed for "generating . . . a query."

### B.  "[expanding/expand] search terms of the query"

| Term | Rule 14's Construction | UiPath's Construction |
|---|---|---|
| [expanding/expand] search terms of the query<br><br>'977 Patent, claims 1, 10, 19; '712 Patent, claims 1, 10, 19; '679 Patent, claims 6 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite. | "applying a lexicon to add additional terms to the search query," otherwise, Indefinite |

A POSITA, upon reviewing the specification, would understand the term "[expanding/expand] search terms of the query" as meaning "applying a lexicon to add additional terms to the search query." While Rule 14 argues that no construction is necessary, its infringement contentions, opening claim construction brief, and expert testimony confirm that Rule 14 seeks to apply an unreasonably broad understanding of the term that would render the limitation meaningless, boundless in scope, and therefore indefinite. Ex. 5 at ¶ 73. Accordingly, UiPath's proposed construction should be adopted.

The '977 Patent describes how a search query is expanded by applying a lexicon:

> At block 104 the query is expanded. In one configuration, the search terms of the query are expanded based on Search lexicons. For example, the lexicons may be applied to expand the search using misspellings and derivations of the topic of interest/sub-topics…

Ex. 1 at 4:17-26; *see also*, 6:40-44. The specification goes on to describe how a "lexicon module" can be used to apply a lexicon to a query and expand its terms. Ex. 5 at 4:21-24; 6:32-44; 9:32-10:42; *see also* accompanying figures and Ex. 5 at ¶ 74.

As explained in the accompanying declaration of Dr. Krein, a POSITA reviewing this disclosure would understand expansion of the search terms of a query to mean "applying a lexicon to add additional terms to the search query" since that is the only thing the specification ever actually explains expansion of search terms of a search query to be. Ex. 5 at ¶ 82.

In an effort to construe this term in an unreasonably broad manner Rule 14 purports to equate "expanding search terms of the query" with nothing more than "further processing" or "refining" of the query, but the specification treats these concepts as separate and distinct from "expansion of the search terms." Indeed, it appears that the goal of Rule 14's proposal is to render the term "expanding search terms of the query" meaningless so that it could read on any form of "processing" or application of a "rule-set based technique." Everything in a computerized system involves "processing" and "rule-sets," rendering the claim term boundless in scope. Rule 14's unbounded approach should be rejected since it would not convey any reasonable scope to a POSITA and invites a finding of indefiniteness. Indeed, were the Court to conclude that the term merely covered any form of processing or generic application of unspecified rules, it should find the term indefinite since a POSITA would not ascertain with reasonable certainty what the scope of the claim actually is. *See* Ex. 5 at ¶ 82.

Rule 14's reliance on a single sentence in the specification stating that "the query may be expanded based on lexical and rule-set based techniques to search structure and unstructured datasets for the keywords of the query" as justifying its unreasonably broad construction is misplaced. (*See* Dkt. 68 at 13). However, this sentence does not purport to distinguish "applying

15

a lexicon" from "rule-set based techniques."  Rather, in view of the prior—and repeated—disclosure of how expansion of search terms is accomplished by applying a lexicon via the lexicon module, it is simply stating that when expanding, both "lexical" and "rule-set based techniques" may be utilized (*i.e.* when applying a lexicon). The disclosure simply describes options that may be utilized in applying a lexicon—but not that any other form of expansion beyond the application of a lexicon may be utilized. Rule 14's interpretation of this sentence begs the question: What sort of "rule-set based technique" might be utilized outside the application of a lexicon? The specification does not describe one, as confirmed by Rule 14's own expert. Ex. 7 at 71:2–73:22.

Rule 14 also asserts that the Asserted Patents refer to "expanding" interchangeably with "further processing" and "refining." Dkt. 68 at 13 (citing Ex. 1 at 6:15-31, 10:52-54).  Not so. The specification repeatedly treats these actions as separate things. *See* Ex. 1 at 6:27-31. That one could "expand" the query **and/or** further process it suggests a reference to different things. With respect to "refining," the patents actually claim "refining" a query as a separate and distinct step from "expanding" the query, such that "refining" should not be construed as an example of "expanding." *See* Ex. 1 at Claim 5 ("[t]he method of claim 1, further comprising: **refining** the search terms based at least in part on the executed query, and in which the monitoring is performed to monitor for matches to a **refined** query.") (emphasis added). *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1378 (Fed. Cir. 2018) (rejecting a construction that would render some dependent claims meaningless); *MicroStrategy Inc. v. Bus. Objects Americas*, 238 F. App'x 605, 609 (Fed. Cir. 2007) ("our case law instructs that different claim terms are presumed to have different meanings.")

In an effort to even further broaden the meaning of "expanding search terms of the query," Rule 14 argues that the term includes adding sub-topics to get more results and exclude "false positives" as well as "narrowing the search to specific sources. Dkt. 68 at 14 (citing Ex. 1 at 6:15-31, 15:62–16:7, 15:48-61, 6:32-39). However, the portions of the specification Rule 14 relies on have nothing to do with expanding **search terms of the query.** The disclosure Rule 14 points to describes "expanding" "**topics of interest**" and/or "**search parameters,**" which are unequivocally not the search terms of the query itself.

"[Expanding/expand] search terms of the query" should be construed as "applying a lexicon to add additional terms to the search query." A construction as broad as what Rule 14 advocates would render the term boundless and indefinite.

### C.  "accuracy threshold[s]"

| Term | Rule 14's Construction | UiPath's Construction |
|---|---|---|
| accuracy threshold[s]<br><br>'977 Patent, claims 1, 10, 19;<br>'712 Patent, claims 1, 10, 19;<br>'679 Patent, claim 6 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite. | Indefinite |

#### 1.  Purely Subjective Terms are Indefinite if Objective Standards Not Found in Specification

For purely subjective terms or terms of degree the specification must provide objective boundaries for measuring the scope of the phrase—otherwise the claim is invalid as indefinite. *Intellectual Ventures* at 1381; *see also Interval Licensing* at 1371; *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005) ("The [subjective] language ... invokes a similar analysis" to terms of degree.) (abrogated on other grounds by *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014)); *Earnie Ball, Inc. v. Earvana, LLC*, No. 2012-1276, 501 Fed. Appx. 971 at 980, (Fed. Cir. Jan. 24, 2013) (patent invalid for use of purely subjective phrase without objective way to discern scope). Courts in this district have repeatedly recognized

that subjective terms render claims indefinite where no objective criterion is provided. *See Halliburton Energy Servs., Inc. v. M-I, LLC*, 456 F.Supp.2d 811, 822-825 (E.D. Tex. 2006) (finding claims indefinite for use of subjective term "fragile gel" without objective standard in specification); *Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc*., 382 F. Supp. 3d 586, 610 (E.D. Tex. 2019) ("more convenient" is purely subjective and indefinite where intrinsic evidence did not provide objective criterion for determining what is "more convenient").

Rule 14 argues that a "patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." Dkt. 68 at 20 (citing *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022)). However, *Niazi*, like *Interval*, also held that "there must be objective boundaries." *Niazi* at 1347. "While beauty is in the eye of the beholder, a claim term, to be definite, requires an objective anchor." *Datamize* at 1350.

### 2. The term is Purely Subjective and the Specification Provides no Objective Understanding, rendering the Claims Indefinite

The '977 Patent does not mention "accuracy threshold" in the specification. Meanwhile, the '712 Patent only mentions the term in parroting the claim language.  *See* Ex. 3 at 2:1–4, 2:18–22, 2:38–42, 26:49–59, 27:6–8. The '679 Patent provides nothing more than the disclosure of the '712 Patent. *See* Ex. 2 at 24:4–13. The specification simply provides no explanation whatsoever with respect to utilizing an "accuracy threshold."

Rule 14 argues that the Asserted Patents disclose terms such as "results threshold," and "satisfactory threshold" which Rule 14s asserts are equivalent to "accuracy threshold."  Dkt. 68 at 21–22 fn. 5; *see also* Ex. 7 at 80:10–15 ("Q: So, is -- I just want to make sure I have this correct. Is it your view that a desired results threshold and a satisfactory threshold, accuracy threshold are generally referring to the same thing? A: That's right."). However, Neither of these

terms have anything to do with "accuracy" and, regardless, both are also subjective terms without any objective guideposts as to their scope. *See* Ex. 5 at ¶ 85.

The only intrinsic evidence bearing on the meaning of "accuracy threshold" is found in an applicant statement during prosecution of the '679 Patent—and only serves to bolster the indefiniteness of the term. In responding to a 6/30/2017 rejection, Rule 14 distinguished prior art disclosing a "relevance score" from the claimed "accuracy threshold." Ex. 8 (rejection) at 12–13; Ex. 9 (applicant response) at 12. *See also* Ex. 5 at ¶ 88. Indeed, Rule 14 specifically noted that "**the relevance of a site is different from the accuracy**." Ex. 9 at 12 (emphasis added); *See also* Krein Decl. at ¶ 88. From this we can gather that an accuracy threshold is definitively **not** a measure of relevance, but it remains purely subjective as to what any conceivable "accuracy threshold" would actually be in this context. That "accuracy threshold" excludes relevance also suggests that "satisfactory threshold" and "results threshold" are not proper substitutes for an "accuracy threshold" since both arguably turn on measures of relevance.

Rule 14's reliance on *OnPoint Sys., LLC v. Protect Animals With Satellites, LLC*, 2022 WL 1612070, at *13 (E.D. Tex. May 20, 2022) is misplaced. There, the Court found that the claims themselves provided guidance on how to determine an appropriate threshold. *Id.* That is not the case here, neither the claims nor the specification explain how one would determine a particular "accuracy threshold" beyond the prosecution history's clear statement that it is unequivocally **not** a measure of relevance.

 Because of the lack of any objective standard for what constituted an "accuracy threshold" in the context of the asserted claims, the term renders the claims indefinite.

### D.  "extractors"

| Term | Rule 14's Construction | UiPath's Construction |
|---|---|---|
| Extractors | No construction necessary, | "applications that monitor |

| | plain and ordinary meaning. | and extract data from user-specified locations or sources of interest (e.g., data source)" |
|---|---|---|
| '977 Patent, claims 9, 18; '712 Patent, claims 9, 18; '679 Patent, claim 8 | | |

Rule 14 provided an express definition for "extractors" in the specification of the Asserted Patents and its express definition should control. *3M Innovative Properties Co. v. Avery Dennison Corp.,* 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("a definition of a claim term in the specification will prevail over a term's ordinary meaning if the patentee has acted as his own lexicographer and clearly set forth a different definition"); *see also Ultravision Techs., LLC v. Govision, LLC,* 2023 WL 2182285, at *5 (Fed. Cir. Feb. 23, 2023) ("display module" required a pair of LED panels where "specification describes that a display module includes a single daughter board connected to two display panels.")

The specifications of the Asserted Patents provide:

Extractors refer to applications that monitor and extract data from user-specified locations or sources of interest (e.g., data source).

Ex. 1 at 7:10–12.

Rule 14 argues that UiPath is defining "extractors" by pointing to a sentence "out of context." Dkt. 68 at 15. However, there is nothing "out of context" with respect to what the patent specification intended an "extractor" to be. Meanwhile, Rule 14's reliance on *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1371 (Fed. Cir. 2005) is misplaced. There, the court relied on disclosures that contradicted a party's interpretation of a term. Nothing in the specification contradicts the express definition of "extractors."

Rule 14 argues that the following excerpt renders UiPath's definition "incomplete and too narrow." Dkt. 68 at 15. "That is, upon deployment, the extractors extract the data from a given source for analysis." Ex. 1 at 7:12–14. Rule 14 then argues that this sentence indicates that

"extractors" can "monitor" data in addition to extracting it and that "extractors can extract data "from user-specified locations or sources of interest" but that the "extractors" are not limited to these limitations. However, nothing in Rule 14's excerpt (Ex. 1 at 7:12–14) contradicts the definition for "extractors" that UiPath relies on. In fact, in the following sentence, the patent discloses that monitoring is required of extractors: "Moreover, until terminated, the extractors are maintained at the data source to monitor for any changes to the data." Ex. 1 at 7:14–16.

There is nothing inconsistent between the express definition of "extractors" provided in the specification and the specification's use of the term "extractors" elsewhere, and the definition should be adopted since the patentee acted as their own lexicographer in providing an express definition.

### E.   "[establishing/establish] a . . . communication channel"

| Term | Rule 14's Construction | UiPath's Construction |
|------|------------------------|-----------------------|
| [establishing/establish] a . . . communication channel<br><br>'977 Patent, claims 1, 10, 19; '712 Patent, claims 1, 10, 19; '679 Patent, claims 1, 11, 16 | No construction necessary, plain and ordinary meaning. | "Set up a communication channel for later communication with a user or user device" |

As a matter of simple grammar and claim structure, the plain meaning for "[establishing/establish] a . . . communication channel" requires setting up a communication channel for later communication with a user or user device. The claims of the '679 Patent separately recite "establishing" a communication channel vs "transmitting" via a communication channel. For example, claim 1 of the '679 Patent recites:

*establishing* a two-way communication channel…

*transmitting*, from the entity via the two-way communication channel…

Ex. 2 at Claim 1 (emphasis added).

The Federal Circuit and this district have held that identical terms within patents belonging to the same family should share the same definition. *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) (Common terms in a patent family should be interpreted consistently); *see also Alcatel USA, Inc. v. Tekelec, Inc.*, 2002 WL 34454104, at *15 (E.D. Tex. Mar. 5, 2002) ("identical terms in the '098 Patent and the '960 Patent will be construed to have the same meaning.")

The Federal Circuit has previously recognized the difference between "establishing" a communication channel and the act of "transmitting" information over such a channel, and has similarly endorsed constructions of "establish" commensurate with what UiPath is proposing here. *See Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1400 (Fed. Cir. 2014) ("As a matter of logic, a mailbox must be established before the contents of said mailbox can be transmitted."); *See also Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 605 (Fed. Cir. 2015) ("A principal definition of 'establish' that most naturally fits this context is: 'set up (an organization, system, or set of rules) on a firm or permanent basis.'")

Much like the language in the '679 Patent, the patent in *Mformation* included both an "establishing" and "transmitting" step. *Mformation* at 1399 ("the separate sub-step for establishing a connection would become 'superfluous' if we concluded that a connection did not have to be established (completed) before transmission.")

### F. "entity"

| Term | Rule 14's Construction | UiPath's Construction |
|---|---|---|
| entity<br><br>'679 Patent, claims 1, 10–11, 16 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite. | "a separate organization such as businesses or police, not a user" otherwise, Indefinite |

### 1. The Intrinsic Evidence Supports that an "entity" is Not Merely a "user."

The boundaries of property patent rights must be clear. *Nautilus* at 901. Prior to the claims that issued in the '679 Patent, an earlier pending set of claims recited the term "user" instead of "entity." Ex. 10 ('679 Patent Prosecution History, 10.31.2016 Claims) at 2. In a 2/9/2017 Final rejection, patentee's use of "first user" was rejected under 35 U.S.C. 103(a) as being unpatentable over the prior art. Specifically, the examiner stated:

> Gonzalez discloses:
>
> "generating, by **a first user**, a query based at least in part on a topic of interest;"[ generating, by **a first user (col. 2 line 47, user)**, a query (col. 2 lines 45-59, search terms) based at least in part on a topic of interest ( col. 2 lines 45-59, concepts)]
>
> Ex. 11 at 8 (emphasis added).
>
> The portion of Gonzalez pointed out by the Examiner states:
>
> In the preferred embodiment, "client files" contain a listing of one or more desired terms or concepts for which **a user** would like to have the FIRST system monitor network 18.
>
> Ex. 12 (U.S. Patent No. 6,260,041 (Gonzalez)) at 2:45–48 (emphasis added)

In a later applicant-initiated interview prior to any claim amendments, the examiner took the following notes:

> Discussed potential claim amendments in regards to the communication channel described on paragraph 0080 of application as published **and to clarify more that the first user is more like a third party** that observes the second user.
>
> Ex. 13 ('679 Patent Prosecution History, 3.23.2017 Applicant Initiated Interview) at 1 (emphasis added).

Finally, the patentee amended the claims in response to the Final Rejection to recite "a first entity" rather than "a first user." Ex. 14 ('679 Patent Prosecution History, 4.10.2017 Claims) at 2. The language including "a first entity" was eventually allowed.

Rule 14 had claimed a user in prior patents of the same family. E.g., Ex. 1 at 20:14–15. Therefore, Rule 14 knew how to a claim a user when it desired, but chose instead to claim an "entity" here. Furthermore, the prosecution history detailed above demonstrates that Rule 14 removed "user" in favor of "entity" specifically to avoid prior art. Accordingly, the term "entity" must mean something other than a user. The '679 Patent prosecution history additionally provides examples of what "entity" is intended to mean—and these examples are consistent with the understanding that "entity" is not merely a "user":

> ... substantially real-time data extraction and analysis may assist **entities, such a police or intelligence agencies and/or businesses**, to monitor specific topics or groups.

> Ex. 15 (3.29.2018 Reply to 12.29.2017 OA) at 11–12 (emphasis added).

Additionally, dictionary definitions for "entity" are consistent with these organizational examples: "an organization (as a business or governmental unit) that has an identity separate from those of its members." Ex. 16 (Merriam-Webster's Collegiate Dictionary, 11th Ed., 2011) at 417. Therefore, an appropriate construction of "entity" is "a separate organization such as businesses or police, not a user."

Rule 14's proposal ignores the intrinsic record, and instead seeks an overly broad construction of the term that would render it boundless—meaning that anything (including a user) would constitute an "entity." Such a broad understanding would not convey to a POSITA the scope of the claim with reasonable certainty and would render the claim indefinite. *See* Ex. 5 at ¶¶ 92–93, 98 ("The term 'entity' has applicability in a wide variety of potential uses, and is not a term of art with a specific or consistent well-known meaning to a POSITA.")

Rule 14 argues that dependent claim 10's recitation of "entity user" means that the term "entity" must include a user. Dkt. 68 at 18. However, the claim language merely  recites an

"entity user corresponding to the entity." If anything, this reinforces the fact that the entity is not merely a user, even though an entity may have "entity users" associated with it.

### G. The "extraction rate," "processing rate," and "dynamically adjust" terms

| Term | Rule 14's Construction | UiPath's Construction |
|------|------------------------|------------------------|
| determine[e/ing] an extraction rate for extracting the data, the extraction rate indicating an amount of the data that is extracted over a first time period<br><br>'679 Patent, claims 1, 11, 16 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite. | Indefinite |
| determine[e/ing] a first processing rate for processing the extracted data with a number of parallel processors, the first processing rate indicating an amount of extracted data that is processed over a second time period<br><br>'679 Patent, claims 1, 11, 16 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite. | Indefinite |
| dynamically adjust[ing] the number of parallel processors for analyzing the extracted data based on the extraction rate to obtain a second processing rate that is greater than the first processing rate<br><br>'679 Patent, claims 1, 11, 16 | No construction necessary, plain and ordinary meaning.<br><br>Not indefinite. | Indefinite |

**1. Identifying *what* "determining" an "extraction/processing rate" and "dynamically adjust[ing] the number of parallel processors" means depends on identifying *how* to perform the "determining" and "dynamically adjust[ing].**

The '679 Patent does not define these terms nor explain how a POSITA would "determine" an "extraction/processing rate" and "dynamically adjust the number of parallel processors."

The Federal Circuit found patents invalid where the patents did not specify *how* to calculate a measurement when there were admittedly multiple ways to do so that yielded different results. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015) ("molecular weight can be ascertained by any of three possible measures: M p, M n, and

25

M w. The claims do not indicate which measure to use. The specification never defines molecular weight or even mentions M p, M w, or M n."); *See also Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 631 (Fed. Cir. 2015).

Like in *Teva*, there are numerous ways to "determine" an "extraction/processing rate" and "dynamically adjust the number of parallel processors." UiPath's expert explained this. E.g., Ex. 5 at ¶ 103 ("the '679 Patent also fails to disclose how such an extraction rate should be 'determined.'… The time period over which the extraction rate might be calculated would have major consequences to both the accuracy and the burden of the calculation. If the period of time is very short and the extraction rate determined infrequently, then the amount of data being extracted may change from being small to large after being 'determined.' Frequent determinations using a short period of time may also overwhelm the system. On the other hand, if the period of time is too long, then the system may be unable to react to the changing needs of the data mining operation."); Ex. 17 (Deposition of Jonathan Krein (Jan. 22, 2025)) at 119:21–22 ("A. There's potentially many ways that one can adjust the number of parallel processors"); 123:22–124:7 ("parallel processor can be many different things, hardware, software, and a variety of different types and configurations. It can be application-level parallelism. It can be hardware-level parallelism. It can be operating system or platform-level parallelism. So there are many, many things here.").

### 2. Rule 14 does not deny that the '679 Patent does not teach *any way* to perform the "extraction rate," "processing rate," and "dynamically adjust" terms.

Rule 14 does not deny the '679 Patent does not teach *how* to "determine" an "extraction/processing rate" and "dynamically adjust the number of parallel processors." Dkt. 68 at 24–26. Likewise, Rule 14's expert could not identify how the specification teaches to perform these functions. E.g., Ex. 7 at 90:15–90:22 ("Q: In the context of the claimed invention and the

claim terms we've been looking at, how does one determine the first time period? A: So, it -- it would depend on the – the parameters of your system. But the -- it doesn't really matter, because the -- it's whatever is going to achieve the accuracy that makes sense for the context.") Indeed, Rule 14's expert Mr. Thompson repeatedly admitted at deposition that how to perform these steps highly depended on the "context" of the system and the specific "implementation"— consistent with Dr. Krein's opinions—which only further demonstrates the multitude of unspecified ways for potentially implementing the claims, rendering them indefinite. *See* Ex. 7, at 91:8–9 ("It would depend on the parameters of the system and the implementation"); 91:21–24 ("But generally, the answer is the same, it's going to depend on the properties of the system and the data that you're – that you're working with"). Mr. Thompson went so far as to admit that one way in which you could practice these elements of the claim would be both by manually making adjustments to the system or automatically. *See* Ex. 7, at 93:11–13.

Mr. Thompson's opinion suggests the claims could cover anything, as their implementation depends on "context" and "implementations." The numerous unknown ways to implement the claims are not disclosed in the specification, leading to uncertainty. A POSITA would not understand the scope with reasonable certainty, making the claims indefinite.

### H. "that matches the query"

| Term | Rule 14's Construction | UiPath's Construction |
|---|---|---|
| "that matches the query" <br><br> '977 Patent, claims 1, 10, 19 | "matches the query" <br><br> Not indefinite | Indefinite |

A typographical error that is not amenable to correction renders a claim indefinite. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1358 (Fed. Cir. 2003); *See also Ocean Semiconductor LLC v. Huawei Device USA, Inc.*, 2022 WL 389916, at *14 (E.D. Tex. Feb. 8, 2022) (holding claim term indefinite when it was unclear how a term should be corrected). To

determine whether a typographical error should render a term indefinite, the court should: First, determine if correction is appropriate. *Novo* at 1357 ("A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.") Second, if the court cannot correct the patent, then determine if the claim, in its uncorrected form, is indefinite. *Id.* at 1358; *See also Trusted Knight Corp. v. Int'l Bus. Machines Corp.,* 681 F. App'x 898, 904 (Fed. Cir. 2017).

### 1. Rule 14 admits "that matches the query" includes an error.

The full claim element is copied below, and makes no sense as written:

"monitoring, based on a set schedule, the at least one data source to extract data from the at least one data source when at least an update to stored data **that matches the query**, newly added data **that matches the query**, or a combination thereof; and"

Ex. 1 at claim 1, 20:21-25 (emphasis added).

This limitation is an incomplete thought. Ex. 5 at ¶ 121. Rule 14 recognized this and admits that it includes an error, and seeks to correct it. Dkt. 68 at 27.

### 2. However, the Claim is Not Amenable to Correction

Were there a single, straightforward way to correct the error, UiPath would simply agree to the correction. However, there are actually multiple, substantively different possible corrections—rendering correction inappropriate. *Fargo Elecs., Inc. v. Iris, Ltd., Inc*., 287 F. App'x 96, 101 (Fed. Cir. 2008) (Correction of term is not appropriate where the term is amenable to multiple different corrections). Alternative ways to correct the claim are proposed below:

| Option 1 (Rule 14) | Option 2 (UiPath) | Option 3 (UiPath) |
|---|---|---|
| monitoring, based on a set schedule, the at least one data source to extract data from the at least one data source when at least an update to | monitoring, based on a set schedule, the at least one data source to extract data from the at least one data source when at least an update to | monitoring, based on a set schedule, the at least one data source to extract data from the at least one data source when **there is** at least an |

| stored data ~~that~~ matches the query, newly added data ~~that~~ matches the query, or a combination thereof; | stored data that matches the query, newly added data that matches the query, or a combination thereof **occurs**; | update to stored data that matches the query, newly added data that matches the query, or a combination thereof; |
|---|---|---|

Each of these three proposed corrections reads on different embodiments for when to extract data from a data source as disclosed in the specification of the '977 Patent:

a) Stored data that previously matched the query is updated regardless of whether the update matches the query. Ex. 1 at 4:62-64 ("[w]hen *information at the data sources is updated* or located to match the query terms, a data extractor extracts the data to be analyzed…") (emphasis added);

b) When the data source is updated, and the update itself matches the query. Ex. 1 at 7:16-18 ("[t]he data changes are analyzed for a match to the key words of the query and the data is transmitted to a data analysis module when there is a match."); and

c) When there is new data at a data source that matches the query. Ex. 1 at 4:62-64 ("[w]hen information at the data sources is updated *or located to match the query terms*, a data extractor extracts the data to be analyzed…") (emphasis added).

Rule 14's proposed correction claims retrieving data when "an update to stored data matches the query" – embodiment (b). The proposed correction also captures "newly added data matches the query" – embodiment (c). UiPath's proposed options, identified as options two and three above, capture all three embodiments, (a), (b), and (c). Ex. 5 at ¶¶ 123, 126.

Rule 14 argues that other patents in the same family correct this error. Dkt. 68 at 27. First, the other patents in this family did not include this error to begin with. Second, patents within the same family are not bound to use the same terms in the same way—indeed, it is equally as likely that the '977 Patent was intended to cover a **different** embodiment from the

other patent rather than the same one. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed.Cir.2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application.")

Rule 14 also argues that there is no basis for UiPath's proposed remedies. Dkt. 68 at 29. But UiPath does not propose complicated remedies, and each of UiPath's proposals is just as consistent with the specification as Rule 14's proposed correction.

There are multiple ways to remedy this term which lead to different claim scope. Therefore, a correction is not proper here. *Fargo* at 101.

### 3. The limitation "that matches the query" is indefinite as written.

The claim as written makes no sense and is therefore indefinite—it cannot possibly convey to a POSITA the scope of the claim with reasonably certainty. And as explained above, a POSITA could not determine which embodiment [(a), (b) or (c), or a combination thereof] was intended to be claimed. Rule 14's expert claims he understands the term as written even if "clunky." Dkt. 68 at 30. However, when there are competing experts, a court looks to the specification. *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 414 F. Supp. 3d 304, 311 (E.D.N.Y. 2019) (The trial testimony of competing experts alone did not establish whether a term was indefinite and required the court to look to the specification). The specification supports all of the proposed embodiments and possible corrections, and it remains uncertain which interpretation the claims attempt to recite without correction. *Fargo* at 101 (claims invalid where the specification and claims do not resolve the way to correct the obvious error).

## IV.    CONCLUSION

For the reasons above, UiPath's proposed claim constructions should be adopted.

Dated: February 25, 2025

/s/ *Ruben J. Rodrigues*
Andy Tindel (Texas Bar No. 20054500)
MT$^2$ Law Group
Mann | Tindel | Thompson
112 E. Line Street, Suite 304
Tyler, Texas 75702
Telephone: (903) 596-0900
Facsimile: (903) 596-0909
atindel@andytindel.com

Ruben J. Rodrigues
Massachusetts Bar No. 676573
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
Email: rrodrigues@foley.com

Alexis K. Juergens
Utah Bar No. 16861
Ray Nelson
Utah Bar No. 17286
Foley & Lardner LLP
95 S. State Street, Suite 2500
Salt Lake City, Utah 84111
Tel: (801) 401-8900
Fax: (801) 799-7576
Email: ajuergens@foley.com
Email: srnelson@foley.com

*Attorneys for UiPath, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via the Court's CM/ECF system per Local Rule CV-5(a)(3) upon all counsel of record on February 25, 2025

<u>/s/ *Andy Tindel*</u>
Andy Tindel